UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
CURTIS CRENSHAW WASHINGTON,      :
                                 :
                                 :
              Petitioner,        :     03 Civ. 1790 (WHP)(THK)
                                 :
     -against-                   :
                                 :     **REPORT AND RECOMMENDATION**
                                 :
DANIEL SENKOWSKI,                :
                                 :
              Respondent.        :
------------------------------X

**TO: HON. WILLIAM H. PAULEY III, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

This habeas corpus proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York.

Petitioner Curtis Crenshaw Washington was convicted after a jury trial, in Bronx County Supreme Court, of Murder in the Second Degree (New York Penal Law § 125.25(3)). He was sentenced to an indeterminate term of imprisonment of twenty-five years to life, and is currently incarcerated in Upstate Correctional Facility in Malone, New York.

Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254, claiming that (1) he was denied the effective assistance of trial counsel, and (2) the prosecutor's questioning and summation violated his due process right to a fair trial. (See Petition ¶ 12.) Respondent seeks the dismissal of the Petition, arguing that both claims are meritless. In addition, Respondent argues that the

Petition may be time-barred. (See Respondent's Memorandum in Opposition ("Resp't Mem.") at 3 n.2.) For the reasons that follow, this Court recommends that the Petition be dismissed with prejudice.

## BACKGROUND

A.  Factual Background

 Laura Martinez lived at 707 E. 242nd Street, and on July 22, 1995, at approximately 7 p.m., she was expecting a visit from Lawrence Minotti, age eighty-four.  Martinez buzzed Minotti into the building.  After two or three minutes, when Minotti did not come to her apartment, Martinez looked out into the lobby where she saw Minotti lying on the floor in a pool of blood.  (Trial Transcript ("Tr.") at 38-41, 44, 48-49.)  Subsequently, the police and an ambulance arrived at the scene, and Emergency Medical Services personnel began treating Minotti, who was bleeding from his head. (See id. at 215-16).  The police did not find Minotti's wallet or leather banded watch at the scene, but found a black plastic watch on the floor. (See id. at 41, 53-54, 216-17, 221-22.) Minotti died three days later from his injuries. (See id. at 42; Resp't Mem. at 2.)

 At the time of the incident, a witness, Eileen Ferrante, who also lived at 707 E. 242nd Street, and her husband Joseph Ferrante, were sitting in front of the building. (See Tr. at 56-57.)  Ms. Ferrante saw two men, one dressed in white, and one dressed in

black, follow Minotti across the street and enter the building close behind him. (See id. at 64-65, 78-81.) After two to five minutes, the two men exited, and walked rapidly east on E. 242nd Street, toward Mount Vernon. (See id. at 70-71, 90, 190-91.) Ms. Martinez came out of the building yelling "they killed him." (Id. at 189-90.) Ms. Ferrante yelled "they did it," indicating the two men who exited the building, and another individual jumped into his car and followed the two men. (Id. at 71.)

On July 22, 1995, at approximately 7:15 p.m., Police Officer John Barnett and his partners, while on patrol in an unmarked vehicle, received a radio transmission that a robbery had occurred at 707 E. 242nd Street, and that it involved a man dressed in white and a man dressed in black, who had fled east on 242nd Street. (See id. at 211-12, 226-27.) The officers drove to Eleventh Avenue and Third Street, which was seven or eight blocks from 707 E. 242nd Street. (See id. at 212.) They saw two men walking on Third Street into Mount Vernon. The men ducked into an alley. (See id. at 212-13.) As the officers drove their patrol car up to the alley and exited the car, the two men started to run and the officers chased them. (See id. at 213.)

The man dressed in black, Rasheen Burgess, stopped running and was apprehended. (See id. at 213.) The man dressed in white, Petitioner, continued running and jumped over a fence. (See id.) Barnett's partners, Officers Costello and Woods, eventually

apprehended Petitioner, and brought him to the police car. (_See id._ at 213-14.) The officers placed Burgess and Petitioner in the police car and drove them to 707 E. 242nd Street. (_See id._ at 215.) Joseph Ferrante testified that when the "police officers came, and they had two black male[sic] for me to identify." (_Id._ at 192.) He testified, that "as best as [he could] recall," they were the same two individuals he had seen go past him at the time of the robbery. (_Id._ at 193.)[1] Mrs. Ferrante testified that the police "brought back [to 707 E. 242nd St.] the two guys that they picked up" and they appeared to be the "same two guys that [she] saw come out of the building minutes earlier." (_Id._ at 73.) Both Joseph Ferrante and Eileen Ferrante conceded that they had not seen the faces of the two men. (_See id._ at 85, 199.)

Burgess and Petitioner were taken to the 47th Precinct for processing. (_See id._ at 107, 183.) Detective Enrico Garcia testified that when he "processed" Petitioner's arrest, he saw that Petitioner's left hand was swollen. (_See id._ at 183-86.) When he was asked to fill out some paperwork, Petitioner said he was left-handed. (_See id._ at 184.) Garcia testified that there was no blood on Petitioner or his clothing, nor were there cuts on his hand.

---

[1] At a pretrial hearing, Officer Barnett testified that he brought Petitioner and Burgess to the bottom of stairs in front of the building on E. 242nd Street. Mr. Ferrante came out of the building with Officer Woods and viewed the suspects, and then went back into the building. (_See_ Hearing Transcript, dated Sept. 4, 1997 ("H."), at 20-23.)

(See id. at 186.)  In contrast, Officer Barnett testified  that he saw that Petitioner had blood on his hand and pants while he was in handcuffs. (See id. at 238-39.)  Barnett vouchered Petitioner's pants, but was unaware if any tests were done on them.  (See id. at 239-40.)  Barnett did not know how the blood got on Petitioner's pants. (See id. at 240.)

Burgess and Petitioner were both released from custody.  They were rearrested on July 27, 1995, for Minotti's murder. (See id. at 113-14.)  On that day, Burgess made a videotaped statement, which he later admitted at trial was "not true." (See id. at 120-21.)  One week before trial, Burgess pled guilty to a charge of robbery in exchange for a promised sentence of five to fifteen years in prison. (See id. at 108-09.)

At trial, Burgess testified that on July 22, 1995, at about 7:00 p.m., he and Petitioner decided to rob an old man and followed him to 707 E. 242nd Street, where they entered the building behind him. (See id. at 98-102.)  Burgess was dressed in black and Petitioner was dressed in white. (See id. at 99.)  Burgess testified that after entering the lobby, Petitioner used his left hand and punched Minotti in the area of his left eye. (See id. at 101-03.)  Minotti fell to the floor and Burgess looked through his back pockets and took his wallet. (See id. at 103.)  Petitioner "went through" Minotti's other pockets. (Id.)  Burgess testified that he never struck or caused injury to Minotti, but admitted that

he robbed Minotti. (See id. at 109-10.) Petitioner and Burgess left the building, Petitioner looked through the wallet, and then Burgess kicked it into a sewer. (See id. at 107-08.)

On cross-examination, Burgess admitted that he made a previous statement on July 22, 1995, where he said that Petitioner had been the one who took Mr. Minotti's wallet, which was not true. (See id. at 127, 129.) Burgess admitted that he "gave another version" of the robbery on July 27, 1995, when he and Petitioner were rearrested. (See id. at 114.) On that date, Burgess said that he did not intend to rob Minotti, which he admitted at trial was not true. (See id. at 114.) Burgess also stated that he returned to 707 E. 242nd Street to check on Minotti's condition on the night of the crime, while, at trial, he admitted that was not true. (See id. at 144-45.) During his grand jury testimony, on July 22, 1996, Burgess stated that, prior to arriving at 707 E. 242nd Street, Petitioner had repeatedly told him that he needed money and a job. (See id. at 134.) However, at trial, Burgess testified that he did not recall Petitioner making those statements, and admitted that he knew Petitioner had a job in his father's barbershop. (See id. at 134-35.)

The State presented an expert witness who testified that Minotti's injuries were consistent with being struck at least once by a fist from the front left side of his body, and striking his head against the ground. (See id. at 168.)

Petitioner did not testify or present any witnesses on his behalf.

The jury returned a verdict finding Petitioner guilty of Murder in the Second Degree. (See id. at 353.)

B.  Post-Trial Proceedings

On March 3, 2000, Petitioner filed a motion pursuant to New York Criminal Procedure Law ("N.Y. Crim. Proc. L.") § 440.10(1)(h), in the Supreme Court, Bronx County, seeking to vacate the judgment of conviction on the ground that he received ineffective assistance of counsel. (See Resp't Mem., Ex. 2.)  On May 25, 2000, the motion was denied. (See Resp't Mem., Ex. 6.)  On August 31, 2000, the Appellate Division, First Department granted Petitioner leave to appeal the denial of his § 440 motion and to consolidate it with his direct appeal. (See Resp't Mem., Ex. 9.)  On direct appeal, Petitioner claimed (1) that he received ineffective assistance of counsel, (2) prosecutorial misconduct, (3) that the court provided improper instructions to the jury, and (4) that his sentence was excessive. (See Pet'r Appellate Brief, Ex. 10 to Resp't Mem.)  On June 14, 2001, the Appellate Division affirmed Petitioner's conviction. See People v. Washington, 284 A.D.2d 185, 726 N.Y.S.2d 257 (1st Dep't 2001).  On December 17, 2001, the New York Court of Appeals denied Petitioner leave to appeal. See People v. Washington, 97 N.Y.2d 689, 738 N.Y.S.2d 305 (2001).  Subsequently, Petitioner filed the instant Petition for a writ of habeas corpus.

**DISCUSSION**

I.  Time-Bar

Respondent contends that the Petition is untimely because it was not filed within the one-year limitation period provided for in 28 U.S.C. § 2244(d)(1), which commenced when Petitioner's judgment of conviction became final.  (See Resp't Mem. at 3, n.2.)  However, Respondent's argument rests on the erroneous contention that various Second Circuit decisions, which conclude that a conviction becomes final when the time for seeking certiorari before the United States Supreme Court has expired (ninety days after the judgment of conviction is entered), are not controlling.

This argument merits short shrift.  The relevant statute provides that "[t]he limitation period shall run from . . . (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  The Second Circuit has determined that "[a] conviction becomes final for purposes of 28 U.S.C. § 2244(d) upon expiration of the ninety-day period to petition for a writ of certiorari to the United States Supreme Court." Pratt v. Greiner, 306 F.3d 1190, 1195, n.1 (2d Cir. 2002); accord Hizbullahankhamon v. Walker, 255 F.3d 65, 68 (2d Cir. 2001); Valverde v. Stinson, 224 F.3d 129, 132 (2d Cir. 2000).  Notwithstanding Respondent's disagreement with that holding, in the absence of a contrary Supreme Court decision, the Second Circuit's conclusion is

controlling in this Court.

In any event, the Supreme Court has spoken on the issue. In Clay v. United States, 537 U.S. 522, 123 S. Ct. 1072 (2003), the Court concluded, in the context of a habeas proceeding challenging a federal conviction, pursuant to 28 U.S.C. § 2255, that the "conclusion of direct review" occurs when the time for seeking a writ of certiorari expires. See id. at 525, 123 S. Ct. at 1075. The Court cited with approval decisions of various courts which have uniformly held, in the context of state habeas proceedings, that "direct review" encompasses review of a state conviction by the Supreme Court. See id. at 528, n.3, 123 S. Ct. at 1077 n.3. Indeed, the reasoning of the Court in addressing the issue of finality in the context of federal convictions, was premised on the implicit understanding that direct review of state court convictions includes certiorari proceedings before the Supreme Court. The Court therefore concluded that there was no reason, in the absence of clear statutory authority to the contrary, to impose a more stringent time constraint on § 2255 petitioners than on those proceeding under § 2244. See id. at 529-30, 123 S. Ct. at 1077-78. Accordingly, the premise of Respondent's time-bar argument is erroneous.

Petitioner's conviction became final on March 21, 2002, ninety days after the New York Court of Appeals denied Petitioner leave to appeal. The Petition was dated February 20, 2003, and was

submitted to prison officials for mailing on that date. That date therefore serves as the filing date. See <u>Houston v. Lack</u>, 487 U.S. 266, 276, 108 S. Ct. 2379, 2385 (1988); <u>Noble v. Kelly</u>, 246 F.3d 93, 97 (2d Cir. 2001). The Petition was thus timely filed within the one-year limitation period.

II.  <u>Standard of Review</u>

<u>     </u>Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); <u>accord Leslie v. Artuz</u>, 230 F.3d 25, 32 (2d Cir. 2000); <u>Clark v. Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United

States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision.  See <u>Williams</u>, 529 U.S. at 412, 120 S. Ct. at 1523; <u>Leslie</u>, 230 F.3d at 32.

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case.  <u>Williams</u>, 529 U.S. at 413, 120 S. Ct. at 1523.  The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable."  <u>See id.</u> at 408-10, 120 S. Ct. at 1521-22; <u>see also</u> <u>Aparicio v. Artuz</u>, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently.  The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); <u>Lurie v. Wittner</u>, 228 F.3d 113, 128-29 (2d Cir. 2000) (same).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parsad v. Greiner</u>, 337 F.3d 175, 181 (2d Cir. 2003) ("The

presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."). A state court's findings of fact "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

III. Petitioner's Ineffective Assistance of Counsel Claims

Petitioner claims, as he did on direct appeal, that his trial attorney was ineffective because: (1) she failed to offer evidence of the fact that DNA testing had eliminated Minotti as the source of the blood stains found on Petitioner's pants, "after first eliciting the fact that there was blood on the pants and then conceding [petitioner]'s presence at the scene;" (2) she failed to move to strike the identification testimony of the Ferrantes or to reopen the Wade hearing, after Mr. and Mrs. Ferrante testified that they did not see Petitioner's face when he entered or left the robbery scene; (3) she failed to elicit evidence of the fact that Rasheen Burgess would have faced a prison term of twenty-five years to life, had he not entered into a plea agreement; (4) she failed to raise an objection to the court's imbalanced and improper jury instructions, which shifted the burden of proof to Petitioner.[2]

_____

[2] Petitioner also asserts that counsel was ineffective for failing to voice objections to alleged prosecutorial misconduct. The viability of this claim is dependent on whether prosecutorial misconduct actually occurred, which is discussed in Section IV, infra.

(<u>See</u> Petitioner's Memorandum in Support ("Pet'r Mem.") at 26-47.)

A. <u>Legal Standard</u>

Ineffective assistance of counsel claims are "squarely governed by the Supreme Court's holding in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984)." <u>Williams</u>, 529 U.S. at 390, 120 S. Ct. at 1511; <u>see also</u> <u>Aparicio</u>, 269 F.3d at 95 n.8. In order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064-65; <u>Lanfranco v. Murray</u>, 313 F.3d 112, 118 (2d Cir. 2002). First, he must establish that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688, 104 S. Ct. at 2064. It is well-settled that "[a]ctions or omissions [by counsel] that might be considered sound trial strategy do not constitute ineffective assistance." <u>United States v. Best</u>, 219 F.3d 192, 201 (2d Cir. 2001)(internal quotations and citations omitted); <u>see also</u> <u>United States v. Bayless</u>, 201 F.3d 116, 130-31 (2d Cir. 2000). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." <u>Cox v. Donnelly</u>, 387 F.3d 193, 198 (2d Cir. 2004); <u>see also</u> <u>Pavel v. Hollins</u>, 261 F.3d 210, 218 (2001). A court may not use hindsight to second guess counsel's tactical choices, <u>see</u> <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065; <u>Cox</u>, 387 F.3d at 198, "simply because the chosen

strategy has failed." <u>United States v. Helgesen</u>, 669 F.2d 69, 72 (2d Cir. 1982); <u>see also</u> <u>United States v. DiTommaso</u>, 817 F.2d 201, 215 (2d Cir. 1987).  In applying this first prong of the <u>Strickland</u> test, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065 (citation and internal quotations omitted).  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003).

To satisfy the second part of the <u>Strickland</u> test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.  "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome" of the trial.  <u>Id.</u>  "The level of prejudice that [a petitioner] need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." <u>Lindstadt v. Keane</u>, 239 F.3d 191, 204 (2d Cir. 2001) (internal quotations omitted).  Counsel's errors must be considered in the "aggregate," in order to determine their cumulative effect.

See id. at 199 (citing Strickland, 466 U.S. at 695-96, 104 S. Ct. at 2069). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700, 104 S. Ct. 2071.

Finally, "[f]or [Petitioner] to succeed . . . , he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that [the court] applied Strickland to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002).

* * * *

Petitioner's counsel was confronted with Burgess's accomplice testimony, which implicated both Burgess and Petitioner in the robbery of Minotti. This was buttressed by the Ferrantes' testimony that they observed two men dressed like Petitioner and Burgess following Minotti and leaving the crime scene immediately before Minotti was found, and Officer Barnett's testimony that he observed two men dressed as described by the Ferrantes six or seven blocks from the crime scene in the same area toward which the Ferrantes' saw the two alleged perpetrators walk. Those two men

turned out to be Burgess and Petitioner, who fled as the police pursued them. Burgess's testimony, that Petitioner punched Minotti with his left hand, was supported by Detective Garcia's testimony that Petitioner stated that he was left-handed, and Garcia's observation that Petitioner's left hand was swollen; in addition, the forensic expert testified that Minotti suffered injuries consistent with being struck with a fist from the left side of the body.

Faced with the difficult task of rebutting this testimony, defense counsel adopted the strategy of conceding that Petitioner was at or around the scene of the crime with Burgess, but argued that Petitioner did not know that Burgess intended to rob Minotti, and it was Burgess, not Petitioner, who struck and robbed Minotti. Since Burgess had given several different versions of what occurred during the robbery, defense counsel attempted to demonstrate that Burgess lacked credibility. She also elicited testimony which established that the Ferrantes never saw Petitioner's face and, thus, had only confirmed that Burgess and Petitioner were dressed as the two men who they saw following Minotti. The Ferrantes were unable to identify Petitioner at trial. In her summation, defense counsel sought to undermine the evidence against Petitioner by asking the jury to consider: 1) the lack of eyewitnesses, 2) that no weapons were found, 3) that there was no fingerprints on the watch found next to Minotti, 4) that Petitioner did not have any

crime proceeds, and 5) that Burgess gave testimony in exchange for a plea agreement allowing him to plead only to a charge of robbery.

Petitioner contends, nevertheless, that his attorney was ineffective, primarily for two reasons.

B. <u>Counsel's Actions with Respect to the Blood found on Petitioner's Pants</u>

At trial, the prosecutor had not referred to, or elicited any evidence of, blood stains on Petitioner's clothing and hands. Nevertheless, during the cross-examination of Police Officer Barnett, defense counsel elicited that when Petitioner was arrested, shortly after Minotti was assaulted, Barnett saw that Petitioner's pants had blood stains on them, and that Petitioner's hand was also bloody. (<u>See</u> Tr. at 238-39.) Barnett testified that he vouchered Petitioner's pants. (<u>See</u> <u>id.</u> at 239.) Counsel questioned Barnett about the source of the blood:

> Defense Counsel: Do you know whether any tests were done on [Petitioner's] pants?
> Barnett: No.
> Defense Counsel: Do you know independently whether—Withdrawn. Do you know how this blood got on his pants?
> Barnett: No.

(Tr. at 240.)

In her summation, defense counsel referred to the blood stains, stating:

> there was allegedly blood on my client at the time he was arrested. . . Yet there is no evidence that that blood was Mr. Minotti's. There is no DNA, there is no testing with respect to the evidence at this time if it was Mr. Minotti's blood. In fact, ladies and gentlemen, I submit to you the reason why my client had a swollen hand and blood on him . . . is that

the apprehension of him caused him to be injured. That's for
you to determine.

(Tr. at 257-58.)

In fact, the blood stains from the pants, as well as stains on
a towel taken from Petitioner, were tested for DNA, and the test
results indicated that the blood was not Minotti's. (See
Affirmation of Kerry Elgarten, dated Mar. 3, 2000 ("Elgarten
Aff."), Ex. 2 to Resp't Mem., ¶¶ 75-78; Pet'r Mem. at 22-24.)[3]

It did not serve Petitioner's interest to elicit evidence of
the fact that he had blood stains on his clothing and hand;
however, once the evidence was elicited, it was clearly important
to dispel any inference that the blood had come from Minotti. The
DNA test results conclusively established that fact. Yet, defense
counsel failed to introduce evidence of the test results.

---

[3] On or about October 5, 1999, appellate counsel Kerry
Elgarten contacted trial counsel, Lynn Calvacca about the case.
(See Elgarten Aff. ¶ 74.) Approximately one week later Ms.
Calvacca forwarded Petitioner's file to Ms. Elgarten which
included a Property Clerk's Invoice indicating that Petitioner's
pants and towel were taken into custody because they had blood
stains on them. Officer Barnett was named as the arresting
officer and finder of the property. (See id. ¶ 76.) Also found in
the file was a "Department of Forensic Biology Laboratory Report"
from the Office of the Chief Medical Examiner, with Petitioner's
voucher number and a "Report of Laboratory Examination" addressed
to ADA Cecile Grossman from Cellmark Diagnostics, referencing the
lab number of the Medical Examiner's report. (See id. ¶¶ 77-
78.) The following was stated in the document:
    Lawrence Minotti is excluded as the source of the DNA obtained
    from stain IA-I from the white pants, stain 1A-2 from the
    white pants and from stain 1B-1 from the towel.
(Id. at ¶ 78.) Before forwarding the file, Ms. Calvacca had
stated to Ms. Elgarten that she did not recall whether or not DNA
testing had been conducted. (See id. ¶ 74.)

Petitioner argues that by not introducing the DNA results in evidence, counsel allowed the jury to infer that the blood on Petitioner came from the victim, and, therefore, that Petitioner struck the victim, as Burgess testified.

_____In response to Petitioner's §440.10 motion alleging his counsel's ineffectiveness, defense counsel submitted an affirmation explaining the reasoning behind her strategy of eliciting evidence regarding the blood found on Petitioner's pants:

a) to contradict and/or impeach the two identifying witnesses. Their identifications were not police arranged. They did not see Mr. Washington's white pants stained with blood when he left the building.

b) to simply make the jury aware that the District Attorney's Office was possibly in possession of unfavorable evidence which they opted not to introduce.

c) to reinforce the idea that if the blood were the decedent's the District Attorney who has to prove his case would have introduced such evidence as direct proof of the defendant's guilt.

d) to lead the jury to the conclusion that the defendant sustained bruises which caused blood stains on his pants during the apprehension: not during the murder itself.

(Affirmation of Lynn Calvacca, dated Apr. 10, 2000, attached as Ex. 5 to Resp't Mem.)(emphasis in original).[4]

------------------------------

[4] Defense counsel did not include in her affirmation an explanation of why she did not present the DNA results; she did represent to appellate counsel, Kelly Elgarten, that she did not recall if DNA testing was done. (See Elgarten Aff. ¶ 74.) However, since copies of the DNA test results were included in defense counsel's case file (see id. ¶¶ 75-78), the Court assumes that she had knowledge of the evidence excluding Minotti as the source of the blood found on Petitioner's clothing. If she lacked such knowledge, then her failure to note the evidence in

19

None of defense counsel's justifications for eliciting the testimony about the blood on Petitioner and his clothing makes sense as "sound trial strategy." The Ferrantes never suggested that they had an opportunity to observe Petitioner and Burgess at great length. Therefore, their failure to see blood on Petitioner's clothing did not serve to impeach their testimony in any meaningful way. Moreover, defense counsel conceded that Petitioner was present at the scene of the crime, so nothing was achieved by impeaching the Ferrantes' testimony. With respect to justifications two and three, defense counsel chose a rather circuitous, and potentially damaging route, for suggesting that the district attorney may have withheld evidence favorable to Petitioner, and that if the DNA evidence was unfavorable to Petitioner it would have been offered by the prosecutor.[5] The DNA evidence was the best and least ambiguous evidence which proved that the blood on Petitioner's clothing had not come from Minotti. Moreover, defense counsel never argued to the jury that the

_____

her file would have reflected conduct which fell below a reasonable professional standard.

[5] Respondent argues that trial counsel could not elicit evidence of the DNA testing because Officer Barnett testified that he had no knowledge of any DNA testing. (See Resp't Mem. at 13.) Nevertheless, counsel could have confronted Barnett with the DNA documents in an attempt to either refresh his recollection or impeach his testimony. In addition, defense counsel could have sought to have the prosecutor stipulate that the DNA testing revealed that the blood on Petitioner's clothing was not Minotti's blood. In any event, Respondent's rationale is not an explanation that defense counsel ever articulated.

prosecutor would have introduced the DNA evidence if it would have supported the case against Petitioner, thus belying defense counsel's post hoc rationale for her "strategy."

Similarly, presenting the DNA evidence would have provided further support for counsel's fourth purported justification, which was to have the jury infer that the blood on Petitioner was from injuries sustained during Petitioner's flight from, and seizure by, the police, rather than during the commission of the crime. Instead, by merely eliciting evidence of the blood stains on Petitioner's clothing, counsel created the risk that the jury would infer that the blood came from the victim, and she did not dispel that inference by presenting the DNA evidence.

The Court recognizes that strategic decisions, even if ultimately unsuccessful, do not necessarily equate with ineffective assistance of counsel. Nevertheless, because there was no plausible benefit to be gained from eliciting evidence that Petitioner had blood on his clothes and hand, without placing the DNA results in evidence, the Court concludes that counsel's actions cannot be considered the result of a strategy calculated to promote Petitioner's interests. See Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003)("If certain [of counsel's] omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, we would find the quality of representation sufficiently deficient to grant the writ"); Pavel, 261 F.3d at 219 (finding counsel's

decisions not to be "strategic" where they demonstrated no regard for his client's interests).

Because counsel's actions created the risk of an unfavorable inference by the jury, and cannot be explained as a reasonable strategic measure, the Court finds that they fell "outside the wide range of professionally competent assistance." Lindstadt, 239 F.3d at 204 (quoting Strickland, 466 U.S. at 690).

Addressing the second prong of the Strickland test, Petitioner argues that defense counsel's errors severely prejudiced Petitioner's case because the jury was led to believe that Minotti's blood was on Petitioner's hand and pants, thus establishing his participation in the robbery. The Court disagrees.

While counsel's errors risked causing the jury to draw such an inference, it is just as probable, if not more so, that they drew no such conclusion. Although Barnett testified that he saw blood on Petitioner, he also testified that he did not know the source of the blood. Moreover, the prosecutor never addressed the subject of the blood, did not argue it in summation, and did not introduce any evidence to suggest that the blood came from Minotti. The Ferrantes did not testify to seeing any blood on Petitioner, and Detective Garcia, who testified that Petitioner had a swollen hand, also did not recall seeing any blood on Petitioner. There was no basis to believe that Petitioner got blood on his pants when he punched Minotti in the face. Moreover, Burgess conceded that he,

as well as Petitioner, had physical contact with Minotti after he fell to the ground, yet there was no evidence that Burgess had blood on his clothing or body. Burgess testified that Petitioner turned Minotti to the side, and then he and Burgess went through Minotti's pockets. The only location Minotti was bleeding from was his head. Therefore, there was no reason for the jury to conclude that Petitioner got blood on his clothing or hands when he was searching Minotti's pockets; instead, as defense counsel argued, it more likely accepted that the blood came from an injury Petitioner sustained when he was climbing a fence in flight from the police.

In the end, although eliciting evidence of blood on Petitioner's clothing could have created an association in the jurors' minds between the blood and Minotti, the prosecutor never argued that there was such a connection, the evidence did not support that connection, and the fact that there was blood on Petitioner's clothing did not actually implicate him in the robbery. Nor would the DNA evidence have been "exculpatory." The fact that the blood on Petitioner's clothing did not emanate from Minotti did not undermine any of the evidence of Petitioner's guilt, including the Ferrantes', Detective Garcia's, and the medical expert's testimony. Most significantly, it was not inconsistent with Burgess's testimony about how the robbery occurred, and it was the jury's view of Burgess's credibility which was most critical to its verdict. See Strickland, 466 U.S. at 696, 104 S. Ct. at 2069 (the totality of the evidence must be considered

when making the determination of prejudice).

Unlike the cases cited by Petitioner (see Pet'r Mem. at 32), where defense counsel failed to introduce evidence of semen results which would have been strong evidence that the defendant was innocent of rape, see Baylor v. Estelle, 94 F.3d 1321, 1324-25 (9th Cir. 1996), or in a case involving a potential death sentence, failed to elicit expert evidence of an analysis of blood, which would have conclusively established that the victim's blood was not on the murder weapon, and dispelled the prosecutor's suggestion to the jury that the victim's blood was on the weapon but had been masked, see Driscoll v. Delo, 71 F.3d 701, 707-09 (8th Cir. 1995), the fact that there was blood on Petitioner's pants did not indicate one way or the other whether Petitioner participated in the robbery, and the blood was not even made an issue by the prosecutor. Thus, Petitioner has not demonstrated that if defense counsel had refrained from questioning Officer Barnett about the blood stains, and had introduced the DNA test results in evidence, there is a reasonable probability that the result of the trial would have been different. See Loliscio v. Goord, 263 F.3d 178, 194-96 (2d Cir. 2001) (where defense counsel elicited testimony that the defendant had confessed to a jailhouse informant, and the strategy for introducing such unfavorable information was incoherent, counsel's performance fell below Strickland standard; nevertheless, because prosecution did not rely on the confession in summation, court concludes that the petitioner was not prejudiced

by the confession).

   C. <u>Counsel's Failure to Object to Identification Evidence at the Wade Hearing and at Trial</u>

Before the trial, the State provided notice of its intention to introduce testimony of a showup identification.  The Court held a <u>Wade</u> hearing on September 4, 1997.[6]  At the hearing, Officer Barnett testified about the "identification" of Petitioner and Burgess by Joseph Ferrante after they were apprehended and taken back to 707 E. 242nd Street.  (<u>See</u> H. at 32.)

Barnett testified that after Petitioner and Burgess were initially apprehended, a motorist who had seen the two men on E. 242nd St., Jason Ferrer, pulled up to the scene, jumped out of his car and said "those are the two people who robbed the old man up on 242nd Street."  (<u>Id.</u> at 9, 18-19.)  But Mr. Ferrer admitted that he had not been a witness to the actual robbery. (<u>See id.</u> at 10-11, 19.) Petitioner and Burgess were then brought to the front of 707 E. 242nd Street, at which point Officer Woods exited and then returned to the building with Mr. Ferrante, and then told Barnett that Burgess and Petitioner were "identified."  However, Barnett was unaware of when the identification took place or what was said.

_____

   [6] A <u>Wade</u> hearing is held when the court seeks to determine the reliability and suggestiveness of a lineup or showup, in order to rule on the admissibility of an identification resulting from the procedure.  <u>See</u> <u>United States v. Wade</u> 388 U.S. 218, 248, 87 S. Ct. 1926, 1943 (1967); <u>see also</u> <u>Kennaugh v. Miller</u>, 289 F.3d 36, 40 (2d Cir. 2002); <u>People v. Jackson</u>, 98 N.Y.2d 555, 559, 750 N.Y.S.2d 561 (2002); <u>People v. Ortiz</u>, 90 N.Y.2d 533, 537, 664 N.Y.S.2d 243 (1997).

(See id. at 19-23.)

After Barnett's testimony, the parties stipulated that Mr. and Mrs. Ferrante had not actually seen the robbery, but they had been outside of 707 E. 242nd Street and had seen two men leave the building immediately after the robbery occurred. (See id. at 25-26.)

The court denied the Wade motion and determined that the police had reasonable suspicion to pursue and stop Petitioner and Burgess, and that the showup identification, where Petitioner and Burgess were "exhibited to a male and a female named Foronit [sic] who identified both defendants" was proper and gave rise to probable cause to arrest Petitioner and Burgess. (See id. at 32-33.) Petitioner argues that in light of the Ferrantes' trial testimony, that they never saw the faces of the two men who departed from the building after the robbery, defense counsel's failure to 1) object to the identification testimony of Mr. and Mrs. Ferrante at trial, and 2) move to reopen the Wade hearing, resulted in ineffective assistance of counsel.

"Generally, a showup identification will be inadmissible when there was no effort to make the least provision for a reliable identification and the combined result of the procedures employed establish that the showup was unduly suggestive." People v. Riley, 70 N.Y.2d 523, 529, 522 N.Y.S.2d 842, 845 (1987). While the defendant bears the ultimate burden of proving undue suggestiveness at an identification, the State must first come forward with

evidence validating admission of the identification.  See People v. Ortiz, 90 N.Y.2d 533, 535, 664 N.Y.S.2d 243 (1997) (prosecution failed to meet its burden of production, given absence of any proof from any witness who could testify to the circumstances under which defendant was actually identified).  Although proof that a showup was close geographically and temporally to the crime will generally satisfy this element of the State's burden, "[t]he People also have the burden of producing some evidence relating to the showup itself, in order to demonstrate that the procedure was not unduly suggestive." Id. at 537.

Petitioner argues that the State failed to meet its burden of production because the evidence presented was "second-hand" evidence from Officer Barnett, who was the only witness who testified at the Wade hearing.  He was not with Mr. Ferrante when he made the identification, and did not hear what was said to him or what Ferrante actually said in making the identification.

Although the People's obligation "to produce a witness who could testify to the circumstances under which the defendant was identified . . . is minimal," People v. Truesdale, 299 A.D.2d 289, 289, 750 N.Y.S.2d 69, 70 (1st Dep't 2002), in order to meet that burden there must be some basis for the witness to relate facts which could reasonably demonstrate that the procedure employed was not suggestive.  In most cases, an arresting officer is competent to testify to the circumstances of the identification, including what  was said to the identifier and what was said by the person

making the identification. <u>See, e.g.</u>, <u>People v. Evans</u>, 258 A.D.2d 273, 685 N.Y.S.2d 62 (1st Dep't 1999).

In the instant case, the arresting officer could merely describe the circumstances under which he detained Petitioner while he was identified; there was no first-hand evidence produced describing the circumstances of the actual identification, that is, what may have been said to the Ferrantes before they made their identification, and what they actually said or did when they identified Petitioner. Defense counsel would therefore have had a reasonably good argument that the State did not meet its burden of validating the identification. Accordingly, defense counsel should have moved to suppress the identification testimony at the <u>Wade</u> hearing.

Nevertheless, Petitioner has not demonstrated that but for defense counsel's failure, the outcome of his trial would have been different. At trial, Eileen Ferrante and Joseph Ferrante both testified that on July 22, 1995, they observed two black males, one dressed completely in white, and the other dressed completely in black, follow Lawrence Minotti up the stairs of the building, exit the building minutes later, and walk off towards Mount Vernon. (<u>See</u> Tr. at 56-57, 64-65, 78-84, 190-91.) On cross-examination, Mrs. Ferrante admitted that she "didn't really look at [the] faces" of the two men that passed her. (<u>See</u> <u>id.</u> at 85.) Mrs. Ferrante testified that the police "brought back [to 707 E. 242nd St.] the two guys that they picked up," and they appeared to be the "same

two guys that [she] saw come out of the building minutes earlier." (See id. at 73.) Mr. Ferrante testified that two men were brought to the building for him "to identify" and "as best as [he] could recall," these were the same two individuals he had seen leaving the scene of the crime earlier. (See id. at 192-93.) Mrs. Ferrante could not identify Petitioner in the courtroom based on her observations on the day of the robbery. (See id. at 87.) Mr. Ferrante also admitted that he did not see the faces of the individuals and he did not identify Petitioner at trial. (See id. at 199.) It is entirely speculative that had the Wade hearing been reopened, Petitioner would have been able to demonstrate that the Ferrantes' identification was the result of suggestiveness on the part of the police. In fact, there was very meager identification testimony at the trial, since neither of the Ferrantes identified Petitioner at trial. Nor is there any evidence that they positively identified Petitioner at the showup. They merely confirmed that the two men they saw in police custody, Petitioner and Burgess, were attired similarly to the two men they saw following Minotti into the building, and were of the same race and gender as those men. The identifying characteristics they recalled were purely a function of their initial observations, prior to the showup identification. In addition, the Ferrantes' observations were an integral part of the narrative that led to the police officers' testimony about the apprehension of Petitioner and Burgess. (See id. at 80-90, 190-91, 194-204.) Accordingly, the

Ferrantes would have still been permitted to testify to their observations of the men at the scene of the crime, as they did at the trial. Cf. Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001) ("if the pretrial process was unduly suggestive, the court must then weigh the 'corrupting effect of the suggestiveness' against other factors indicating that the identification may be independently reliable) (quoting Manson v. Brathwaite 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977)); Dunnigan v. Keane, 137 F.3d 117, 128 (2d Cir. 1998)(finding that where there are suggestive pretrial procedures, identification testimony may nonetheless be admissible if a "threshold level of reliability can be established through evidence that is independent of the suggestive procedure"); Styers v. Smith, 659 F.2d 293, 297 (2d Cir. 1981)("Even grossly suggestive procedures will not require suppression of a witness' [in-court] identification testimony if it is clearly reliable, independent of improper procedures.").

Moreover, defense counsel's questions on cross-examination made clear to the jury that the "identifications" by the Ferrantes, after the police brought Petitioner and Burgess back to the building where Minotti was robbed, were made without the Ferrantes' having previously seen their faces. As a result, the Ferrantes' vague identification testimony was further weakened, and moving to re-open the Wade hearing would have accomplished little and may have resulted in drawing undue attention to the showup identification. Cf. Sanders v. Greiner, No. 98 Civ. 1603 (JSM),

30

1999 WL 325524, at *1 (S.D.N.Y. May 20, 1999) (trial counsel not ineffective for strategically opting not to reopen the <u>Wade</u> hearing after police officer and eyewitness provided alleged inconsistent testimony, because moving to reopen the hearing "created a risk that the testimony of the eyewitness might ultimately have been strengthened or highlighted for the jury").

Finally, since the Ferrantes were unable to identify Petitioner at trial, and they conceded that they never saw Petitioner's face, their testimony was not so prejudicial as to undermine confidence in the outcome of the trial. Defense counsel made the legitimate strategic decision to concede Petitioner was with Burgess. To have argued otherwise would have been futile and somewhat preposterous, since (1) Petitioner and Burgess were arrested several blocks away from the scene of the robbery, as they fled from the police, (2) they fit the description of the two individuals seen following Minotti into the building and then fleeing, and, most significantly (3) Burgess testified that he and Petitioner robbed Minotti. The Ferrantes' testimony, which, in fact, did not explicitly identify Petitioner as one of the perpetrators, added virtually nothing of significance which could have affected the outcome of Petitioner's trial. Accordingly, even if it was error for defense counsel to fail to seek to reopen the <u>Wade</u> hearing and to challenge portions of the Ferrantes' testimony, there is no reasonable possibility that had she done so, the outcome of Petitioner's trial would have been different.

D.  <u>Counsel's Failure to Inform the Jury of the Maximum Sentence Burgess Faced Had he Not Pled Guilty</u>

At trial, the jury learned that Burgess agreed to a plea bargain for a sentence of five to fifteen years for robbery, in exchange for his testimony against Petitioner. (<u>See</u> Tr. at 108.) Although defense counsel vigorously attempted to impeach Burgess's credibility as a result of the agreement, at no point did she make the jury aware that Burgess could have faced a sentence of twenty-five years to life in prison if he had not made a deal and had been convicted of Second Degree Murder.  Petitioner argues that counsel was derelict in failing to elicit the sentencing information because it would have served to support the argument that Burgess had an incentive to assist the prosecutor, which may have influenced his testimony against Petitioner.

There can be no doubt that it would have been in Petitioner's interest to expose any motive Burgess had to testify against Petitioner that would have undermined his credibility.  Burgess's testimony was the critical evidence implicating Petitioner in a felony murder.  Thus, making the jury aware of the length of the sentence Burgess avoided through his plea bargain would have furthered that objective.  While there is no apparent reason why defense counsel should have failed to elicit this information, her failure did not effect the outcome of Petitioner's trial.

Defense counsel did make the jury aware that, although Burgess participated in the robbery and, thus, the felony murder of

Minotti, he only pled guilty to the crime of robbery, and received a sentence for that offense alone. (See id. at 111, 123, 127-129, 152-53.)  Counsel elicited other information at trial which undermined Burgess's credibility, most particularly the earlier inconsistent statements he provided about the robbery. (See id. at 110, 112-17, 120-21, 126-29, 144-45.)  Counsel also elicited on cross-examination that Burgess smoked marijuana four or five times a week, that it required money to purchase marijuana, and that he smoked marijuana on the day of the robbery and murder of Minotti. (See id. at 136-38.)

During summation, defense counsel emphasized Burgess's lack of credibility by highlighting his motive to lie and previous inconsistent statements regarding the incident. (See id. at 259-265, 267.)  In addition, the court provided instructions to the jury regarding its duty to determine the credibility of each witness, and specifically advised the jury that it could consider Burgess's plea agreement and accomplice status as facts which had a bearing on his credibility and the weight to accord his testimony. (See id. at 304-08.)  Although the potential length of the sentence Burgess avoided by cooperating would have assisted in highlighting Burgess's incentive to lie, sufficient information was presented to the jury regarding Burgess's motivation in testifying, and propensity to dissemble, so as to make it highly improbable that the verdict would have been different had the jury known the precise sentence Burgess could have faced for felony murder.

E. <u>Counsel's Failure to Object to Jury Instructions</u>

     Petitioner argues that counsel was ineffective in failing to object to several alleged errors made by the court in its instructions to the jury. The Court must therefore determine whether defense counsel's failure to object to the instructions was "objectively unreasonable" and, if so, whether the outcome of Petitioner's trial would likely have been different had counsel made such objections. <u>See</u> <u>Cox</u>, 387 F.3d at 198; <u>Larrea v. Bennett</u>, 368 F.3d 179, 183 (2d Cir. 2004). Generally, it is objectively unreasonable for counsel to fail to object to a jury instruction "only when the trial court's instruction contain[s] clear and previously identified errors." <u>Aparicio</u>, 269 F.3d at 99; <u>see also</u> <u>Larrea v. Bennett</u>, No. 01 Civ, 5813, 2002 WL 1808211, at *3 (S.D.N.Y. Aug. 2, 2002).[7] "Conversely, when a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance."

---

     [7] There is a line of Second Circuit cases which construes the "objectively unreasonable" standard in the context of defense counsel's failure to anticipate a change in the law. <u>See</u> <u>Bloomer v. United States</u>, 162 F.3d 187, (2d Cir. 1998) ("Although an attorney is not usually faulted for lacking the foresight to realize that a higher court will subsequently identify a defect in jury instructions similar to those used at his client's trial . . . an attorney nonetheless may be held responsible for failing to make such an objection when precedent supported a reasonable probability that a higher court would rule in defendant's favor.") (internal quotations omitted); <u>McKee v. United States</u>, 167 F.3d 103, 108 (2d Cir. 1999) (same). As the Second Circuit has observed, those case "arose in a particular factual and procedural context," <u>Larrea</u>, 368 F.3d at 184 n.3, and they have no relevance to the facts of this case.

<u>Aparicio</u>, 269 F.3d at 99; <u>see also</u> <u>United States v. Arena</u>, 180 F.3d 380, 396 (2d Cir. 1999)("Failure to make a meritless argument does not amount to ineffective assistance"); <u>Duncan v. Greiner</u>, No. 97 Civ. 8754 (JGK), 1999 WL 20890, at *10 (S.D.N.Y. Jan. 19, 1999) (since trial counsel's objection would have been fruitless, "the failure to object is not evidence of ineffective assistance of counsel").  In assessing whether a jury instruction was clearly erroneous, it is a "well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400 (1973).

Petitioner claims that the court erroneously asked the jury to choose between the defense's contention, that proof of guilt had not been established beyond a reasonable doubt, and the prosecution's contention, that Petitioner committed the crime.  The court told the jury:

> Both claims cannot be true.  What is the truth?  It is for you to answer that question, that's why you have been brought here as jurors.  It is for you to say what the facts are.

(Tr. at 324.)

Petitioner argues that this instruction erroneously shifted the prosecution's burden of proof because the court's statement excluded the possibility that a defendant could in fact have committed a crime, but may still be entitled to an acquittal if the evidence failed to establish the defendant's guilt beyond a reasonable doubt.  He further argues that the jury's role was to

assess whether the prosecution had met its burden of proof, not to assess what the truth was. See People v. Rivera, 116 A.D.2d 371, 375-76, 501 N.Y.S.2d 817, (1st Dep't 1996)(finding error where the prosecutor characterized the trial as a "search for the truth," because it suggested that the jury could convict even in the absence of proof beyond a reasonable doubt). However, the court's instruction must be viewed in its context. Immediately before the trial judge made the statement Petitioner contends was erroneous, he stated that "the People contend that upon all the evidence they have established beyond a reasonable doubt that the defendant committed the crime" (Tr. at 323), and the "defense, on the other hand, contends that the People have failed to prove the guilt of the defendant beyond a reasonable doubt. . . . (Id. at 324.) Thus, placed in context, the "opposing contentions" described by the court referred to the parties' different views on whether the prosecution had proven petitioner's guilt beyond a reasonable doubt. Those two views were correctly described as contradictory and mutually exclusive. Accordingly, there was no sound basis for defense counsel to object to the instruction.

As for the reference to the jury's duty to determine "the truth," this instruction did not refer to the prosecutor's burden of proof. Rather, it too merely referred to the jury's need to decide which contention was true: that the prosecution established Petitioner's guilt beyond a reasonable doubt, or failed to do so. It did not diminish the prosecution's burden of proof, and was not

otherwise inappropriate, particularly since the "beyond a reasonable doubt" standard was explained and repeated at various points in the jury instructions. Cf. Justice v. Hoke, 45 F.3d 33, 35 (2d Cir. 1995) (finding that the trial court's charge, including instructing the jury to "zero in on . . . who's telling the truth, who is fudging, who's honest," as a whole, was not reasonably likely to cause the jury to apply an incorrect standard of proof because the charge included a comprehensive instruction regarding the presumption of innocence and reasonable doubt); Richter v. Artuz, 77 F. Supp. 2d 385, 387 (S.D.N.Y. 1999) (use of the term "search for the truth" did not implicate constitutional guarantees, where jury was instructed at various points about the state's burden of proof); Bacchus v. New York State, Nos. CV-93-1247 and CV-94-3073 (DGT), 1995 WL 62599, at **7-8 (E.D.N.Y. Feb. 8, 1995) (finding no reasonable likelihood that court diminished the prosecution's burden of proof when it instructed the jury, "who speaks the truth? This is the question for you to determine," because the court provided instructions regarding the presumption of innocence and reasonable doubt).

Petitioner further contends that the jury instruction, which used the phrase "if you think there is a real possibility that [petitioner] is not guilty" (Tr. at 295), diminished or shifted the prosecutor's burden of proof. The Second Circuit has criticized the use of the "real possibility" language used by the court because it could "provide a basis for confusion and may be

37

misinterpreted by jurors as unwarrantedly shifting the burden of proof to the defense." United States v. McBride, 786 F.2d 45, 51-52 (2d Cir. 1986). Nevertheless, neither the Second Circuit nor the Supreme Court has held that the use of such language per se warrants reversal. See Victor v. Nebraska 511 U.S. 1, 27, 114 S. Ct. 1239, 1253 (1994) (holding that jury instructions which equated reasonable doubt with "substantial doubt," and "not a mere possible doubt," taken as a whole, correctly conveyed the concept of reasonable doubt to the jury, and, in a concurring opinion, expressing approval of a federal Pattern Jury Instruction for reasonable doubt containing the phrase "real possibility")(Ginsberg, J., concurring); United States v. Reese, 33 F.3d 166, 172 (2d Cir. 1994) (finding that the potentially confusing "real possibility" language viewed in the context of the entire jury charge, was not a ground for reversal of conviction).

Moreover, the challenged instruction, when viewed in its context, did not alter or undermine the "beyond a reasonable doubt" standard. In the paragraphs preceding and following the language which referred to "a real possibility," the court emphasized that "the People's proof must be more powerful than [the more likely than not standard]. It must be beyond a reasonable doubt . . . proof that leaves you firmly convinced of the defendant's guilt" (Tr. at 294), and "each element of any crime charged, as I will define it, must be proved beyond a reasonable doubt." (Tr. at 295.) Here too, there was no sound basis for defense counsel to

38

object to the charge, and her failure to do so had no impact on the outcome of the trial.

Finally, Petitioner contends that language in the jury charge stating that "justice demands that the innocent be protected and that the guilty be convicted" (Tr. at 297), is a misleading statement which suggests a lower burden of proof than proof "beyond a reasonable doubt." The Second Circuit has described "protect the innocent" language as "diluting the State's burden of proof beyond a reasonable doubt and undermining the presumption of innocence." See Floyd v. Meachum, 907 F.2d 347, 354 (2d Cir. 1990). However, the context in which such language was used in Floyd is substantially different than in Petitioner's case. In Floyd, the prosecutor suggested that the jury could draw negative inferences from the defendant's failure to testify, mistakenly referred to a Fifth Amendment burden of proof, and stated in his summation that "the Fifth Amendment . . . is a protection for the innocent and not a shield to protect the guilty." Id. As the Court noted, fundamental constitutional rights are not conditioned on a defendant's guilt or innocence. Similarly, in United States v. Doyle, 130 F.3d 523 (2d Cir. 1997), the court's jury instruction, in referring to the constitutional guarantee of the "presumption of innocence," and the prosecutor's burden of proving guilt beyond a reasonable doubt, erroneously stated "[y]ou must keep in mind that those rules are designed to protect the innocent and not the guilty." Id. at 533. The Second Circuit reaffirmed that

"[constitutional rights] apply to all criminal defendants without regard to their actual guilt or innocence," id. at 538, and found that other language in the jury charge did not mitigate the injury which resulted from the erroneous instruction.[8]

In contrast, the court's charge in Petitioner's case did not advise the jurors that the presumption of innocence and burden of proving guilt beyond a reasonable doubt were intended to protect only the innocent. Rather, before stating that "[j]ustice demands that the innocent be protected and that the guilty be convicted" (Tr. at 297), the court advised the jurors that "the law throws certain safeguards around a defendant which cannot be ignored and must be enforced," and, immediately after making the challenged statement, the court emphasized the need for the jury to acquit if Petitioner's guilt had not been proven beyond a reasonable doubt, and to convict if it had been. (Id. at 297-98.) Thus, the charge was not clearly improper, and defense counsel's failure to object was not unreasonable.

The court's charge in its entirety included multiple references to the People's burden of proving Petitioner's guilt beyond a reasonable doubt, and instructed that the People's burden

---

[8] Despite the Second Circuit's disapproval of the use of language which suggests that the presumption of innocence and "beyond a reasonable doubt" standard are designed to protect the innocent, the Court later concluded that under AEDPA those cases could not provide the basis of habeas relief because the Supreme Court has not directly addressed such jury instructions. See Delvalle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002).

never shifted to Petitioner at any stage of the trial. (See id. at 8-10, 12-13, 293-96, 298, 323, 324.)  The court reviewed each crime with which Petitioner had been charged, and cautioned the jurors that they should convict him of those crimes only if they were "satisfied beyond a reasonable doubt" that he was guilty of them, and that, if it had a reasonable doubt as to any element of any of those crimes, Petitioner should be acquitted of the crime. (Id. at 325-28.)  The court also stated that "no defendant is required to prove his innocence.  He is presumed to be innocent unless and until the contrary is proved." (Id. at 293-94.)

Because none of the challenged instructions were inaccurate statements of the law, and they did not cause substantial prejudice to Petitioner, particularly when viewed in their context, defense counsel's failure to object to them was not unreasonable, and, even if she had objected, there is no reasonable likelihood that the outcome of the trial would have been different.

* * * *

Based on a review of the entire trial record, and viewing counsel's errors in the "aggregate," Lindstadt, 239 F.3d at 199, the Court concludes that defense counsel's overall performance did not fall below professionally competent standards such that she was no longer "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S. Ct.  at 2064;  see also Muyet v. United States, No. 03 Civ. 4247 (PKL), 2004 WL 2997866, at *5 (S.D.N.Y. Dec. 27, 2004) ("The reviewing

court must assess an attorney's actions in the context of all the surrounding circumstances to determine if those actions were 'reasonable under prevailing professional norms')(quoting Strickland, 466 U.S. at 688, 104 S. Ct. at 2064); Smalls v. Mcginnis, No. 04 Civ. 0301 (AJP), 2004 WL 1774578, at *25 (S.D.N.Y. Aug. 10, 2004) ("Even if . . . trial counsel's actions resulted from error rather than strategy, trial counsel's performance must still be accorded a certain degree of deference, as the Sixth Amendment does not guarantee error-free, perfect representation.")(internal quotations omitted); Harris v. Hollins, No. 95 Civ. 4379 (HB), 1997 WL 633440, at *6 (S.D.N.Y. Oct. 14, 1997) ("Taken in its totality, petitioners claim must fail because he has not demonstrated that counsel's conduct fell below that of a reasonable attorney, or that the jury would have found him not guilty but for counsel's ineffective performance").

In light of the evidence, defense counsel pursued the only realistic defense available to Petitioner, by arguing that Petitioner was unaware that Burgess was going to rob Minotti and that Petitioner did not play an actual role in the robbery. She competently cross-examined civilian, expert, and police witnesses. Defense counsel's questions revealed that Eileen Ferrante, Joseph Ferrante, and Laura Martinez did not observe the robbery or the faces of the persons responsible for it, and they could not identify Petitioner at trial. (See Tr. at 52, 84-85, 196-97.) Counsel vigorously attempted to impeach Rasheen Burgess's

credibility by demonstrating that he had provided three different versions of the events surrounding the robbery, and that Burgess's two prior statements to the police, and his sworn testimony before the grand jury, contained fabrications. (See id. at 110-15, 118-19, 126, 134-35, 144-45.) Defense counsel also gave a coherent summation which highlighted the weaknesses in the witnesses' testimony. (See id. at 253-56, 259-62.) Counsel argued that Burgess had an incentive to lie because of his plea bargain, in which he received a reduced sentence of five to fifteen years in prison in exchange for testifying against Petitioner. (See id. at 259.) Despite the oversights and errors which have been discussed, counsel's overall performance was sufficient to constitute meaningful representation. See Jeremiah v. Artuz, 181 F. Supp. 2d 194, 203 (E.D.N.Y. 2002)(examining "counsel's overall performance" and finding that, despite possible oversights or errors in judgment, there was no ineffective assistance where trial counsel ably presented the petitioner throughout the trial, cross-examined prosecution witnesses, elicited trial testimony in an intelligible fashion, and gave an organized and coherent summation in which he forcefully urged the jury to evaluate the gaps in evidence); Morris v. Garvin, No. 98 Civ. 4661 (JG), 2000 WL at 1692845, at *3 (E.D.N.Y. Oct. 10, 2000) (finding that the Sixth Amendment does not guarantee "error-free, perfect representation" but merely a "wide range of professionally competent assistance").

        In addition, any errors which defense counsel made were not so

prejudicial as to undermine confidence in the outcome of Petitioner's trial. See Loliscio, 263 F.3d at 195 (even where counsel's performance was objectively unreasonable, petitioner was not prejudiced and, therefore, was not denied effective assistance of counsel); Lindstadt, 239 F.3d at 204 ("Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt."); United States v. Simmons, 923 F.2d 934, 956 (2d Cir. 1991)("[G]iven the plethora of evidence against [petitioner], there is little reason to believe that alternative counsel would have fared any better"). As discussed, the case against Petitioner consisted of accomplice testimony from Burgess implicating Petitioner in Minotti's robbery and murder, that was corroborated, in part, by (1) testimony from the Ferrantes that two individuals dressed similarly to Petitioner and Burgess were seen following Minotti into the building and then leaving the building shortly thereafter, (2) evidence that Petitioner and Burgess fled from the police and were apprehended, shortly after the crime was committed, in the same area towards which witnesses described the perpetrators to have been walking, (3) Detective Garcia's testimony that on the day of Petitioner's arrest, Petitioner confirmed that he was left-handed, and Garcia observed that Petitioner's left hand was swollen, and (4) the expert testimony that Petitioner's swollen hand was consistent with Burgess's description of the cause of Minotti's death, a blow by Petitioner's left hand to the area of Minotti's left eye.

In light of the evidence supporting Petitioner's guilt, and the limited options available to defense counsel, Petitioner has not demonstrated a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. As the Appellate Division found, "counsel's overall performance was more than adequate, given the difficulty of the case from a defense point of view. While the People's case rested on the testimony of an accomplice, this testimony was corroborated by extremely strong circumstantial evidence, and counsel's alleged deficiencies could not have deprived Petitioner of a fair trial." Washington, 284 A.D.2d at 186, 726 N.Y.S.2d at 257. This Court is unable to conclude that the state court's determination was an objectively unreasonable application of the Strickland standard. Accordingly, the Court recommends that Petitioner's ineffective assistance claim be dismissed.

IV. <u>Prosecutorial Misconduct</u>

Petitioner claims that the prosecutor engaged in misconduct by (1) improperly vouching for Burgess's credibility by placing his own integrity and the prestige of the District Attorney's Office behind Burgess's testimony, and (2) making other improper remarks which attacked the propriety of defense counsel's arguments, inflamed the jury's emotions, and instructed the jury on the law.

A habeas petitioner claiming prosecutorial misconduct must show that the prosecutor has engaged in "egregious misconduct"

amounting to a violation of the petitioner's due process rights. See Donnelly v. DeChristoforo, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873-74 (1974); Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003). "It is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986). Improper remarks will constitute a denial of due process only when they cause "substantial prejudice" by "so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002)(quoting Darden, 477 U.S. at 181, 106 S. Ct. at 2471). To be entitled to relief, a petitioner must demonstrate that he "suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict." Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998)(quoting Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994)). To determine whether there was substantial prejudice, this Court must view the allegedly objectionable remarks in the context of the entire trial. See Greer v. Miller, 483 U.S. 756, 765-66, 107 S. Ct. 3102, 3109 (1987); United States v. Thomas, 377 F.3d 232, 244 (2d Cir. 2004); United States v. Bautista, 23 F.3d 726, 732 (2d Cir. 1994). In doing so, the Court will consider "[t]he severity of the misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct." United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004); see also Tankleff, 135 F.3d at 252.

A.  The Prosecutor's Vouching for Burgess's Credibility

Petitioner claims that the prosecutor improperly injected his own credibility and integrity into the trial, made himself an unsworn witness, and improperly bolstered Burgess's testimony.

As an initial matter, bolstering rarely gives rise to a claim of constitutional dimension which is cognizable on habeas review. See Ramirez v. Miller, No. 04 Civ. 2967 (WHP)(JCF), 2005 WL 659144, at *5 (S.D.N.Y. Mar. 11, 2005) (Report & Recommendation); see also Peakes v. Spitzer, No. 04 Civ. 1342 (RMB)(AJP), 2004 WL 1366056, at *15 (S.D.N.Y. June 16, 2004) (there is no federal constitutional right against bolstering which is cognizable on habeas review) (Report & Recommendation, adopted on July 22, 2004)(citing cases); Malik v. Khoenan, No. 94 Civ. 8084 (LLS), 1996 WL 137478, at *4 (S.D.N.Y. Mar. 26, 1996) (same).  Nevertheless, the prosecutor may not become an unsworn witness claiming to have knowledge of facts at issue in the trial, inject his own credibility into the trial, or express his personal beliefs about matters which the jury must consider. See Floyd, 907 F.2d at 354; Peakes, 2004 WL 1366056, at *17; Morales v. Miller, 41 F. Supp. 2d 364, 378 (E.D.N.Y. 1999).

However, a prosecutor is permitted to respond to and counter the defense's attempts to paint prosecution witnesses as untrustworthy and lacking in credibility, and is permitted to comment on evidence in the record, including witness credibility. See United States v. Perez, 144 F.3d 204, 210 (2d Cir. 1998); Ramirez, 2005 WL 659144, at *7; Peakes, 2004 WL 1366056, at *17.

Petitioner objects to the prosecutor's questioning of Burgess about the terms of his plea bargain, citing to the following exchange:

> Prosecutor: And as a matter of fact, did you a short time ago plead guilty to robbery in this Court?
> Burgess: Yes.
> Prosecutor: And, did you make a deal with the District Attorney's Office?
> Burgess: Yes. . .
> Prosecutor: Which District Attorney did you make a deal with?
> Burgess: You. . .
> Prosecutor: And what do I get in exchange, Mr. Burgess, what were you going to do that I wanted done?
> Burgess: The truth.
> Prosecutor: Did I make any other conditions besides your telling the truth, sir?
> Burgess: No.
>                         * * * *
> Prosecutor: And Mr. Burgess, with regard to this deal, did you or your lawyer come to the District Attorney asking for a deal or did we come to you offering a deal?
> Burgess: The Assistant District Attorney, Ms. Cecile Grossman, came to me asking me for a deal.
> Prosecutor: So we came to you, you didn't come to us, is that correct?
> Burgess: Yes.

(Tr. at 108-09.)

The prosecutor's questions merely elicited the terms of the plea agreement, which were clearly relevant to the jury's assessment of Burgess's credibility. Although it would have been preferable for the prosecutor to refrain from personalizing his involvement in the plea negotiations, he was, in fact, involved in those negotiations. At no point during the direct examination did the prosecutor "vouch" for Burgess's credibility. Although the bargain included "truthful testimony" as a condition, it remained for the jury to determine whether it had been honored, and the prosecutor did not

48

offer his personal opinion on that issue.

Petitioner also takes issue with the prosecutor's summation, where he referred to the plea bargain by stating: "[W]hat I'm trying to say is that you can deduce from this evidence why a deal was made. That doesn't take any special effort. You can see why I made a deal." (Tr. at 285.) In her cross-examination, defense counsel questioned Burgess about his plea agreement, and about various inconsistencies between his testimony and prior statements which he gave to the police and before the grand jury. During summation defense counsel characterized Burgess as an "opportunist" and a "liar," who "[did] not know the truth if it hit him on the face." (Id. at 259-60.) Counsel argued that Burgess had a motive to lie because of his plea bargain. (See id. at 259.) While it was permissible for the prosecutor to respond and to point out why Burgess's testimony was not tainted by the plea bargain, his use of the words "why I made the deal" placed his integrity in issue by implying that he would not have entered into the deal if Burgess was not credible. The Court agrees that it was improper for the prosecutor to suggest to the jurors that his views and conduct were matters for them to consider. The prosecutor's implied "voucher" for Burgess's credibility "invited the jury to view its verdict as a vindication of the prosecutor's integrity rather than as an assessment of guilt or innocence based upon the evidence presented at trial." Floyd, 907 F.2d at 354.

Petitioner also objects to the prosecutor's reference, at two

points during his summation, to the fact that he was an attorney "arguing for the People of the State of New York." (Tr. at 271, 291.) The prosecutor's passing reference to his office simply described his role in the trial, made no reference to the evidence, and was not made in the context of arguing the credibility of any witnesses. See Yu v. United States, No. 97 Civ. 2816 (RWS), 1998 WL 160964, at *10 (S.D.N.Y. Apr. 7, 1998)(finding that the prosecutor's statement identifying herself as a representative of the government was not equivalent to an improper interjection of her integrity into the case). These remarks were certainly not egregious.

In sum, of the three instances of alleged improper vouching by the prosecutor, only one was truly objectionable. It is clear that the objectionable comment was not so prejudicial as to have had an effect on the verdict or deprive Petitioner of a fair trial. The comment about the prosecutor's decision to enter into a plea agreement was made only in summation and was itself fairly vague. See United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) ("Here, the prosecutor's offending behavior was confined to his summation: his opening statement and his conduct throughout the six-day trial were free of improper remarks. This was not a trial marked by passion and prejudice."). In fact, defense counsel did not even object to the comment. Moreover, in its instructions, the court minimized any harm that could result from the comment. See Feliciano, 223 F.3d at 123-24 (concluding that any prejudice caused

50

by the prosecutor invoking the integrity of his office was sufficiently corrected by the district court's instructions); Bermudez v. Portuondo, No. 00 Civ. 4795 (LAP)(KNF), 2004 U.S. Dist. LEXIS 5427, at **116-17 (S.D.N.Y. Mar. 29, 2004) (concluding that prosecutor's improper use of the pronouns "I" and "me" in summation did not deny petitioner due process where the trial court instructed the jurors that statements made by counsel were not evidence).

The trial court instructed the jurors that they were the "exclusive judges of the facts in [the] case." (See Tr. at 298.) The jury was told that counsel's opinions and arguments were not evidence, and that the juror's recollection of the facts controlled. (See id. at 309-10.) Finally, the court explicitly, and at some length, instructed the jury that Burgess's plea bargain may have created a motive to testify falsely (see id. at 304-05), and even instructed the jurors that they should consider Burgess's testimony with more caution because he "may have reason to make up stories or exaggerate what others did because he wanted to strike a good bargain with the government." (Id. at 307.) Thus, the court's instructions, which specifically advised the jury to consider the plea bargain as a factor weighing against Burgess's credibility, rather than a measure of the prosecutor's integrity, served to cure any prejudicial effects of the comments by the prosecutor. Cf. Tankleff, 135 F.3d at 253 (even where the trial court did not give a specific curative instruction, the Second

Circuit "conclude[d] that the standard instructions given by the trial court were probably sufficient to cure any harm that the prosecutor's misstatements may have caused").

B. Other Prosecutorial Remarks

Petitioner claims that the prosecutor improperly sought to arouse sympathy from the jurors and inflame their anger by using phrases such as "the old, the frail, the easy target," "little old Lawrence Minotti," and by saying that he spoke "on behalf of the Minotti family." (Tr. at 272-73, 291.) Although a prosecutor should not make arguments calculated to inflame the jury's passions or prejudices, see Elias, 285 F.3d at 190, most of the prosecutor's tcomments reflected facts in evidence, for example, Mr. Minotti was eighty-four years old and his right arm was paralyzed as a result of a stroke suffered prior to the robbery. (See Tr. at 35-36, 53.) Moreover, Burgess testified that Minotti's age was a factor in the decision to rob him. (See id. at 101.) In addition, Minotti's age and physical condition were relevant to the charges against Petitioner. If the jury had acquitted Petitioner of Second Degree Murder, it would have had to consider whether Petitioner was guilty of First Degree Manslaughter, which requires an evaluation of intent to cause serious physical injury. (See id. at 318-319; N.Y. Penal Law § 125.20 (1).) The frailty of the victim would have informed an evaluation of whether an alleged punch by Petitioner reflected an intent to cause serious injury.

Although the prosecutor's comment, that he spoke "on behalf

of Mr. Minotti's family," was an obvious appeal to the jury's sympathy, it was not so egregious as to deny Petitioner a fair trial, particularly in light of several curative instructions. The prosecutor himself stated that the jury should not let "personalities, likes or dislikes, sympathy or prejudice affect your judgment. I'm not asking you to feel sorry that a man was killed . . ." (Tr. at 291.) The court also instructed the jurors that they should not "permit human emotions either of sympathy or of prejudice to intervene in their cool and careful processes of thought while analyzing the testimony. . ." (Id. at 296-97.)

Petitioner also claims that the prosecutor urged the jury to overlook inadequacies in the evidence. In actuality, the prosecutor argued that the perpetrators "picked" their victim and circumstances "well," and now will benefit from the "reasonable doubt" standard, being that there were few witnesses and the victim is dead. (See id. at 272.)

It is impermissible to suggest that the jury should abandon the reasonable doubt standard, in order to prevent a defendant from benefitting from a dearth of evidence. See Floyd, 907 F.2d at 354 (finding that prosecutor's comments that the petitioner should not be allowed to use reasonable doubt as "a shield" for his guilt, diluted the State's burden of proof and improperly suggested that the jury could convict even if not convinced of guilt beyond a reasonable doubt). Here, the prosecutor did not do so. In fact, the prosecutor referred to the jury's duty to evaluate and

reconcile any inconsistencies in the evidence employing the reasonable doubt standard. (See Tr. at 286-87.) Further, the court gave curative instructions, by reminding the jury that counsels' opinions and arguments were not evidence, and that the jurors' recollection of the facts controlled. (See id. 309-11.) If the jury found counsels' arguments to be "invalid or illogical or inconsistent with the evidence or the law," it was directed to disregard those arguments. (Id. at 310.) The court repeatedly instructed the jury as to the People's burden to prove the defendant's guilt beyond a reasonable doubt (see id. at 8-10, 12-13, 293-96, 325-28), countering any confusion which may have resulted from the prosecutor's comments. Cf. Tankleff, 135 F.3d at 253 (standard instructions on burden of proof and that attorneys' arguments are not evidence, were sufficient even to mitigate a summation comment which mischaracterized evidence which was not before the jury); Lugo v. Kuhlmann, No. 98 Civ. 8662 (RPP), 1999 WL 946793, at *20 (S.D.N.Y. Oct. 7, 1999)(petitioner's claim that prosecutor improperly made statements shifting the burden of proof caused petitioner no prejudice where trial judge clearly instructed jury on proper burden of proof).

Finally, Petitioner contends that the prosecutor improperly instructed the jury on the law several times through the use of misleading and improper examples.[9] In two instances, the court

---

[9] Petitioner did not cite to specific statements made by the prosecutor or explain why they were improper. (See Pet'r Mem. at 51.)

sustained defense counsel's objections to the use of examples by the prosecutor, and <u>sua sponte</u> informed the jurors that it would instruct them on the law. (<u>See</u> Tr. at 280-82, 289-90.)  Thus, any impropriety by the prosecutor was cured.[10]

Viewing all of the challenged remarks collectively, Petitioner has not shown that they were of sufficient significance to violate his due process rights.  Cumulatively, the alleged prosecutorial misconduct consisted of several isolated statements, which were not egregious, did not permeate the trial, and were addressed by the court's instructions, thus eliminating any substantial prejudice to Petitioner.  <u>See</u> <u>Tankleff</u>, 135 F.3d at 253 ("severity of the prosecutor's misconduct . . . was mitigated by the brevity and fleeting nature of the improper comments" and "the evidence was [not] so closely balanced that the prosecutor's comments were

---

[10] Petitioner argues, without providing any specific examples, that a pervasive theme of the prosecutor's summation was to improperly denounce defense counsel's cross-examination of the witnesses, and her summation, for attempting to trick or mislead the jury. (<u>See</u> Pet'r Mem. at 50.)  While it is not the Court's role to search the record for alleged improprieties, we assume that one of the remarks Petitioner has in mind is the statement that defense counsel's argument attacking Detective Garcia's credibility was "silliness." (Tr. at 285.)  The prosecutor's remark was no more than the fairly routine rhetoric used in summations, was addressed to a specific argument defense counsel made, and did not improperly denigrate the role of defense counsel. <u>See, e.g.</u>, <u>Elias</u>, 285 F.3d at 190 n.3 ("We see nothing inherently wrong with characterizing a defense tactic as desperate."); <u>United States v. Millar</u>, 79 F.3d 338, 343-44 (2d Cir. 1996)(rejecting claim that the prosecutor's characterization of a defense tactic as "hog wash" and a "smoke screen" conveyed to the jury a fundamental misconception of the role of defense counsel); <u>United States v. Perry</u>, 643 F.2d 38, 51 (2d Cir. 1981) (finding it a "permissible rebuttal" for the prosecutor to characterize defense tactic as "struggling" and "desperate").

likely to have a substantial effect on the jury"); <u>Bentley</u>, 41 F.3d at 825 (denying habeas relief where "prosecutor's summation comments were both brief and isolated," and there was compelling evidence in the prosecution's case); <u>Bradley v. Meachum</u>, 918 F.2d 338, 343 (2d Cir. 1990) ("While we do not condone trial misconduct, the prosecutor's improper behavior, limited as it was to the summation, did not permeate the trial. The cumulative effect of the challenged statements here was not so inflammatory or egregious as to require a finding of substantial prejudice."). Accordingly, the Court recommends that Petitioner's claim of prosecutorial misconduct be dismissed.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that the Petition be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of a denial of a federal right, this Court recommends that no certificate of appealability be issued. <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Lucidore v. N.Y. State Div. of Parole</u>, 209 F.3d 107, 112 (2d Cir. 2000). I further recommend that the Court certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from its order would not be taken in good faith. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 445-46, 82 S. Ct. 917, 921 (1962).

Pursuant to 28 U.S.C. § 636(b)(1))(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. <u>See</u>

Pursuant to 28 U.S.C. § 636(b)(1))(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. See also Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Pauley. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: May 5, 2005
New York, New York

Copies sent to:

Lawrence T. Hausman, Esq.
The Legal Aid Society
166 Montague Street - 9th Floor
Brooklyn, New York 11201

Kimberly Morgan, Esq.
Assistant District Attorney
198 East 161 Street
Bronx, New York 10451